**FILED**

2017 Jun-08  PM 03:51
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE NORTHERN DISTRICT OF ALABAMA COUNTY, ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| Whitney Elizabeth FOSTER | ) |
| | ) Jury Trial Demanded |
|     Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| ADVANCED CORRECTIONAL HEALTHCARE INC. | ) Case No.: 5:16-cv-521 |
| Dr. Arthur WILLIAMS; Emmanuel MBI; Tanya JONES; | ) |
| Sherri HAKES; Maria SANCHEZ; Demetrus JOHNSON; | ) The Honorable Madeline |
| Denetris HUDGINS; Mary JONES; Michelle KIRK; | ) Hughes Haikala, presiding |
| C. ASHLEY; D. SMITH; | ) |
| | ) |
| MADISON COUNTY; Blake DORNING; | ) |
| Jerry MORRISON, as the personal representative of | ) |
|     Estate of Steve Morrison, deceased | ) |
| Cassie MALONEY; Sheree KING; Joyce WILLIAMS; | ) |
| Benzilla ANDERSON; Mildred PATTON | ) |
| Charity BEASLEY; Shelby SPICER; | ) |
| Felicia DESHIELDS; Emily NOBLES | ) |
| | ) |
|     Defendants | ) |

## FIRST AMENDED COMPLAINT

    Comes now the Plaintiff, Whitney Elizabeth Foster, who alleges the following facts, asserts the following causes of action, and claims the following damages.

### Parties, Jurisdiction, and Venue

    1. Whitney is over the age of nineteen years, and she is a resident citizen of Madison County, Alabama.

    2. Defendant ACH is a foreign corporation that is incorporated under the laws of the State of Illinois and has its principal place of business in the State of Illinois. ACH is authorized to do business in the State of Alabama by the Alabama Secretary of State.

3. ACH is a correctional healthcare company. It does substantial business in the State of Alabama. Specifically, ACH is under contract with various Alabama governments to provide medical care and treatment to detainees, jailees, and prisoners. By and through such contracts and undertakings in the State of Alabama, ACH has purposefully directed its activities towards the State of Alabama, and it has derived substantial profits from the State of Alabama.

4. ACH's registered agent for service is the C.T. Corporation System, which can be served at 2 North Jackson Street, Suite 605, in Montgomery, Alabama 36104.

5. Defendant Dr. Arthur Williams is a physician who undertook to provide medical care to Whitney at the Madison County Jail. He violated the applicable standard of care by failing to possess and exercise that level of reasonable care, skill and diligence in his treatment of Whitney that similarly situated physicians in the same general line of practice would have used.

6. Defendants Emmanuel Mbi, Tanya Jones, Sherri Hakes, Maria Sanchez, Demetrus Johnson, Denetris Hudgins, Mary Jones, Michelle Kirk, C. Ashley, and D. Smith (hereafter the "Nurses") were all registered or licensed practical nurses who undertook to provide medical care to Whitney while she was at the Madison County Jail. They violated the applicable standard of care by failing to possess and exercise that level of reasonable care, skill and diligence in their treatment of Whitney that similarly situated registered or licensed practical nurses in the same general line of practice would have used.

7. Dr. Williams and the Nurses were all employed by ACH during the events made the basis of this suit. All of their actions in relation to Whitney as further set forth herein were done within the course and scope of their employment with ACH.

8. Defendant Madison County is an Alabama public corporation. It can be served by and through Dale W. Strong, the Chairperson of the Madison County Commission, at 100 Northside Square, Courthouse 700, in Huntsville, Alabama 35801. Whitney filed/served a verified notice of claim on the Chairperson of the Madison County Commission on March 10, 2015.

9. Defendant Blake Dorning was the Madison County Sheriff at all relevant times. As the sheriff, he is responsible for management of the Madison County Jail. He has a nondelegable statutory duty under Alabama law to attend to the medical needs of detainees and jailees in the Madison County Jail. He is sued in his individual capacity only.

10. Defendant Steve Morrison served as the Jail Administrator of the Madison County Jail at all relevant times. Dorning delegated his statutory duties regarding medical care of inmates to Morrison. Morrison is sued in his individual capacity only.

10.1. Defendant Steve Morrison died on October 30, 2016. The Probate Court of Madison County, Alabama, has appointed Jerry Morrison as the administrator of the Estate of Steve Morrison (Case No. 64926). On December 14, 2016, Jerry Morrison (in his capacity as personal representative) was substituted as a party defendant in place of Steve Morrison. (D.50) Whitney filed a verified statement of claim with the Probate Court on December 22, 2016.

11. Defendants Cassie Maloney, Joyce Williams, Benzilla Anderson, Mildred Patton, Sheree King, Charity Beasley, Shelby Spicer, Felicia DeShields, and Emily Nobles (hereafter the "Officers") were correctional officers under the employment of Sheriff Dorning. All their actions in monitoring and caring for Whitney were done within the course and scope of their employment with Dorning and under the supervision of Dorning and Morrison. The Officers are only sued in their individual capacity.

12. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) over Count 1 and 2, which assert personal injury claims against the Defendants pursuant to 42 U.S.C. § 1983. This Court has supplemental federal jurisdiction pursuant to 28 U.S.C. § 1367(a) over Counts 3 thru 6, which assert personal injury claims against the Defendants under Alabama law.

13. Venue is proper in this division and district pursuant to 28 U.S.C. § 1391(b)(1),(c)(2),(d) because ACH resides in this division and district under the meaning of this statue. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this division and district.

<u>Statement of Facts</u>

14. Long before the events made the basis of Whitney's injury, ACH undertook to provide medical care to the detainees and jailees at the Madison County Jail by and through a written contract with Madison County and Dorning as Madison County Sheriff. The contract stated that "[i]nmates in the detention facility shall have access at all times to constitutionally adequate healthcare."

15. The contract required ACH to "develop, manage and staff a comprehensive

healthcare services system at the [Detention Facility] in Huntsville," "to provide all inmates within the Detention Facility with necessary healthcare," to be "responsible for all health care for all inmates at the Detention Facility," and to be the "sole supplier of healthcare services … and coordinator of the healthcare delivery system at the Detention Facility."

16. The contract also required ACH to deliver unimpeded and necessary healthcare services (including medical, dental, and mental health services) to inmates that can be audited against established standards; to operate the healthcare program in a humane manner with respect to the inmate's right to basic healthcare services; to operate the healthcare program at full staffing and use only licensed, certified, and professionally trained personnel; to implement a written healthcare plan with clear objectives, policies, and procedures; and to maintain an open and cooperative relationship with the Sheriff's administration and staff.

17. ACH has had the Madison County Jail contract since before 2010. ACH underbid other competitors to get the contract. ACH got the contract by touting its ability to control the expenses Madison County would incur for outside medical care in hospitals. ACH, Madison County, and Dorning negotiated a $200,000 per quarter cap on outside medical care. If outside medical care costs exceeded $200,000 in a quarter, Madison County would be responsible. If ACH beats the cap, ACH gets to keep the difference between actual outside costs and the cap as profit. The $200,000 per quarter number was designed by Madison County and Dorning to give ACH a financial incentive to control outside medical costs, which in turn has led ACH to delay and deny referrals to outside providers. ACH's business model, reflected in the agreement, succeeds by underbidding the competition and implementing severe cost control measures, the necessary result of which is unnecessary inmate suffering.

17.1. In addition and in the alternative to the allegations in paragraph 17, to the extent that the contract was amended weeks prior to Whitney's incarceration to contains a provision that any unused amount should be returned to the County, the $200,000 per quarter cap that was in place for the four years prior to Whitney's incarceration continued to play a role in depriving detainees with medical care. The Sheriff, the County, ACH, Dr. Williams, and Morrison all knew that four years of entrenched custom and practice simply does change overnight, especially when this alleged contract change was only a small part of the overall momentum to deprive detainees with necessary outside medical care. The Sheriff, the County, ACH, Dr. Williams, and Morrison did nothing to notify nurses and jailers of this change. Nor did they do anything to change the other aspects their other deliberately indifferent policies and customs as set forth herein. Instead, the Sheriff, the County, ACH, Dr.

-4-

Williams, and Morrison acted with deliberate indifference by allowing the other aspects of their deliberately indifferent policies to continue.

17.2. Furthermore, the Sheriff, the County, ACH, Dr. Williams, and Morrison only made this alleged contract change because it had been sued numerous times (see paragraphs 24-25, infra) and the $200,000 contract provision was an easy way for inmates affected by their deliberate indifference to establish that the policies were deliberately indifferent. The Sheriff, the County, ACH, Dr. Williams, and Morrison only made the contract change to remove this glaring evidence of their deliberate indifference, but they changed nothing else. In other words, they left in place all of the other aspects of their deliberately indifferent policies as set forth herein that are more difficult to detect and prove. This conscious decision to keep their deliberately indifferent policies in place and only remove the most visible indicia of their wrongful conduct is, in and of itself, strong evidence of their on-going deliberate indifference to the serious medical needs of inmates.

18. Irrespective of the agreement, Dorning, Morrison, and Madison County have failed and refused to address known systemic deficiencies regarding medical care at the Madison County Jail. Madison County conspired with Dorning and Morrison to cooperate with ACH and Dr. Williams in controlling costs. Dorning, Morrison and Madison County were aware of ACH's business model, and were aware ACH put cost control over inmate health and safety, yet they retained ACH as the contractor (initially and via express and implied contract renewals) because it saved money. Dorning, Morrison, and the County knew that ACH implemented cost control measures through less staffing, hiring substandard medical personnel willing to put costs over inmate health and safety, denying inmates medications, and delaying or denying medically necessary referrals to outside providers.

19. Madison County, Dorning, Morrison, ACH, Dr. Williams, and others established deliberately-indifferent customs or policies concerning medical care of detainees and jailees. Specifically, they had a explicit or implicit agreement, plan, and policy of delaying or denying necessary medical treatment to avoid liability for inmate medical bills. This plan included a policy of delaying or denying necessary medical treatment by outside providers. With deliberate indifference to the serious medical needs of inmates, Madison County, Dorning, Morrison, ACH, and Dr. Williams (a) failed to develop and implement adequate policies and procedures for the handling of detainees and jailees with serious health conditions; (b) failed to develop and implement adequate policies and procedures for the training of correctional officers and medical staff to respond to the serious medical needs of detainees and jailees. Moreover, correctional officers were trained to defer to ACH regarding medical

matters and to not to contact outside emergency personnel even if there is a medical emergency. Correctional officers who have contacted outside emergency personnel directly have been disciplined.

20. As part and parcel of their plan and policy outlined above, ACH, Dr. Williams, Dorning, Morrison, and Madison County developed a policy and practice regarding treatment of inmates withdrawing from alcohol and drugs. These Defendants were aware that severe withdrawal symptoms could only be safely treated in a hospital. However, they established a custom or policy that withdrawal would always be managed inside the jail or by getting the person released from jail, regardless of the severity of the symptoms. Defendants were aware of the risk of harm of such a policy but explicitly or implicitly agreed to this practice to avoid the costs associated with hospitalization.

21. Moreover, the agreement required ACH to provide substantial insurance coverage, to name Madison County and Dorning as additional insureds, and to indemnify Madison County and Dorning, and their agents and employees in connection with any claim related to healthcare services. Under the contract, as long as correctional officers let ACH medical personnel make medical decisions, correctional officers are indemnified by ACH's insurance carrier.

22. Because of this agreement, the correctional officers at the Madison County Jail subjectively believe that they cannot be responsible for deficient medical care by ACH personnel, and they were regularly told this by Dorning, Morrison, and other Jail supervisors. Thus, the contract and policies stated above encouraged correctional officers to defer to ACH personnel.

23. These Defendants knew their policies and customs created a substantial risk of serious harm to detainees and jailees and that it would result in the infliction of unnecessary pain and suffering on detainees and jailees. These Defendants were on notice that their plan was harmful to the health of detainees and jailees. These Defendants had such knowledge from prisoner complaints, communications from correctional officers, from their own observations, from common sense, from other deaths, from other lawsuits, and in other ways.

24. During 2013, at least three inmates (Nikki Listau, Tanisha Jefferson, and Deundrez Woods) died as a result of the failure of ACH and correctional personnel at the Madison County Jail to provide inmates with basic medical care. The circumstances of these deaths are described in full the amended complaints filed in Section 1983 lawsuits filed against these Defendants. (See Elliott v. Madison Cnty.,

et al, Case No. 5:14-cv-1309 (D.53)(Smith); Jefferson v. Madison Cnty., et al, Case No. 5:14-cv-1959 (D.8)(Kallon); Woods v. Madison Cnty., et al, Case No. 5:14-cv-1964 (D.8)(Bowdre)). The facts of those amended complaints are incorporated by reference as if fully set forth herein. All three inmates died even though they had been seen by ACH personnel. All three inmates died when ACH and Madison County Jail personnel refused to send them to the hospital. In all three cases, correctional officers deferred to ACH medical personnel even though (1) it was obvious to a layperson that the inmate needed to be sent to a hospital for evaluation and treatment and (2) it was obvious to the correctional officers that ACH was doing nothing for the detainee/jailee. In November 2015, Doring, Morrison, Madison County, and others filed an action that is pending in this Honorable Court to require ACH's liability insurers to defend and indemnify them for their wrongful conduct in the three lawsuits filed. (See Dorning, et al. v. Essex Ins., et al., Case No. 5:15-cv-1997 (Davis). Upon information and belief, however, they have done nothing to change their policies that are deliberately indifferent to the constitutional rights of detainees/jailees.

25. Correctional officers involved in all thee of these cases deferred to ACH personnel because they were trained by Dorning and Morrison to do so and/or it was the established custom to do so. Nevertheless, it was well known to Madison County Jail correctional officers that ACH had a practice of delaying or denying referrals of inmates for outside medical care. Correctional officers were aware that ACH was making medical care decisions regarding inmates that put cost control over inmate health and safety. Correctional officers had this knowledge from the incidents described above, from other similar incidents that occurred over the years, from their daily observations regarding how ACH personnel treated inmates, and in other ways.

26. Dorning and Morrison made it clear to correctional officers that inmate healthcare costs were a problem at the jail, that one trip to the hospital could potentially blow the county's healthcare budget, and that they needed to cooperate with ACH to control costs. These concerns with inmate healthcare costs have been reported in the media. In an April 18, 2014 article (which was published after the three deaths described above, but before Whitney suffered her permanent injuries), Morrison quoted as discussing the budget for medical care. Morrison was quoted as stating that because even one "catastrophic" case can "really cripple your budget" that Dorning and Madison County were undertaking an "aggressive pursuit" of cost savings.

27. Pursuant to longstanding practice, jail healthcare is treated as solely within the discretion of ACH personnel. Pursuant to longstanding practice, all inmate grievances related to medical care are directed to ACH, which ignores them. These

Defendants are well aware that ACH provided substandard and frequently inhumane medical care. However, none of these grievances are investigated by Dorning, Morrison, or Madison County. Correctional officers are well aware of this custom of indifference. This policy further encouraged correctional officers to "punt" to ACH and do nothing to help detainees/jailees with serious medical needs.

28. Consistent with the policy of deferring to ACH, neither Dorning nor Morrison nor anyone else at Madison County took any steps to investigate the circumstances of the three deaths stated above. This has been a longstanding practice of Dorning, Morrison, and Madison County. In 2010, 2011, and 2012, Julie Jean, Emanuel Patterson, and Frederick Foster died under circumstances similar to those in the 2013 deaths, particularly Woods's death. Like Woods, they were on medical watch, were checked by correctional officers every fifteen minutes, did not eat or drink in substantial amounts, did not have her vital signs monitored, was completely out of touch with reality, and deteriorated over the course of days until they became non-responsive. There was no investigation of the death of Jean, Patterson, or Foster by Dorning, Morrison, or Madison County. Even after the obvious systemic problems that led to at least six deaths and permanent blindness injury suffered by Whitney -- over the course of just over four years -- Dorning stated in an October 2014 interview with the media that believes the responsibility for the deaths and for making changes lies solely with ACH: "I'm sure ACH will evaluate how they do things."

29. However, upon information and belief, Dorning, Morrison, and Madison County have never requested ACH to make changes or improve the care of inmates. Furthermore, they know from years of experience with ACH, and from ACH's failure to respond to the deaths themselves and to other incidents, that ACH will conduct no evaluation and institute no training or other changes.

30. In summary, the deliberately-indifferent policies and practices of ACH, Dr. Williams, Dorning, Morrison, and Madison County in place at the Madison County Jail include, but are not limited to, the following:

a. Not investigating serious known incidents of deliberate indifference by ACH and correctional personnel.

b. Not evaluating or responding to inmate grievances regarding medical care.

c. Placing inmates with serious medical conditions in medical watch when they obviously need, at a minimum, further testing and evaluation at a hospital.

d. Training correctional officers to defer to ACH medical decisions even when it is obvious the inmate needs to immediately go to the hospital.

e. Allowing inmates in medical watch to deteriorate over the course of hours and days without taking the inmate for evaluation and treatment at a hospital.

f. Training correctional officers to defer to ACH decisions to allow inmates in medical watch to deteriorate over the course of hours and days without taking the person to a hospital for evaluation and treatment of the obvious deterioration.

g. Relying on untrained correctional officers to monitor seriously ill inmates who are placed in medical watch.

h. Not training correctional officers regarding what signs to look for and document while monitoring inmates under suicide or medical watch.

i. Not monitoring the vital signs of inmates who are placed in medical watch.

j. Not requiring correctional officers to document their observations of inmates being monitored for suicide or medical risk.

k. Treating the responses of incoherent inmates as refusals to cooperate.

m. Not treating an inmate's deterioration to the point they are no longer ambulatory as a condition requiring evaluation and treatment in a hospital.

n. Not investigating, by testing or otherwise, the causes of significant deteriorations of inmate health or symptoms that obviously indicate potentially life-threatening conditions.

o. Continuing failed treatment regimens even after they have proven ineffective.

p. Denying inmates with serious pain appropriate pain medication, including narcotics.

q. Not taking inmates suffering from serious complications related to detoxification from alcohol and drugs to the hospital.

31. Whitney was twenty-eight when she was arrested on April 4, 2014, during a routine traffic stop on an outstanding warrant from 2008 for possession of drug

paraphernalia.

32. At the time of her arrest, Whitney had been living with her parents and had been drug free for months. She recently had a child, and she was attending a methadone clinic and taking prescription Xanax. She was taking adequate and responsible steps to distance herself from her past drug abuse.

33. Whitney was taken to the Madison County Jail and booked on April 4, 2014 at 7:34 p.m. Four and a half hours later, at 12:08 a.m. on April 5, 2014, Nurse "C. Ashley" noted in Ashley's jail medical record after interviewing Whitney that she was currently being treated at the "Methadone Clinic" in Huntsville and that she was taking 80mg of methadone in treatment daily.

34. Under the "Other" section of this report, Nurse Ashley noted that Whitney brought "no meds brought in," and that someone needed to "verify" Whitney's meds "@ methadone clinic." However, there is no indication in any of Whitney's medical records that any of the Defendants or anyone else verified this information from the methadone clinic. It is also noted on this report under the "Withdrawal History" section of the report that Whitney had told Nurse Ashley that she previously experienced methadone withdrawal symptoms.

35. Whitney should have been considered a "high risk inmate" because she was taking 80 mg of methadone daily up to the time of her incarceration. An 80 mg daily dose is a high dose that would have been administered under the supervision of a methadone clinic.

36. Dorning, Morrison, ACH, Dr. Williams, the Nurses, and the Officers all knew this. They also all knew that methadone withdrawal can cause a person to have elevated blood pressure, which can cause serious life-threatening conditions, including strokes and seizures.

37. Drug and alcohol withdrawal is a frequent illness suffered by detainees in jails. Dorning, Morrison, ACH, Dr. Williams, the Nurses, and the Officers knew the signs and symptoms of drug and alcohol withdrawal from training and past experiences, they knew the condition was potentially life-threatening, and they knew that such persons should be treated reasonably and responsibly to avoid a medical emergency.

38. Within a week of Whitney's incarceration she began to show visible signs of being weak and suffering from methadone withdrawal. Her visible symptoms

escalated in severity each day. Although Defendants knew Whitney was 100% dependent on them for methadone, blood pressure medicine, and other medical care -- and that she could not get these things on her own -- they did nothing to help her.

39. Beginning on April 5, 2014, Whitney began experiencing elevated blood pressure noted on the vitals record as 150/110.

40. On April 6, 2014, Whitney began experiencing stomach cramps and increased anxiety. She was placed on vistaril and dicyclomine. In a later note for that visit, it is noted this was "protocol for withdrawal patients." Whitney's blood pressure at that time was 144/98.

41. According to the vitals report, Whitney's blood pressure continued to be recorded as elevated on numerous occasions.

42. Whitney knew the symptoms of high blood pressure because some of her family members suffered from it. Within one week of being incarcerated in the Madison County Jail, she began experiencing symptoms of high blood pressure. She began complaining to the correctional officers and the medical staff and asked to be seen by a doctor.

42.1. Every time her blood pressure was taken while she was incarcerated, the nurses would take multiple readings, making her take deep breaths until they got the lowest possible reading. They only wrote the lowest readings down. There were a multitude of  readings in the 200s that never got written down.

43. Whitney's family also began calling the Madison County Jail as they could tell something was wrong because her speech was slurring during calls home. The family continued to call back and tried to find out information about Whitney's situation, but got nowhere.

44. The Nurses did not call a doctor. Instead, they turned the air conditioning to 55 degrees, only issued her a plastic sheet, and kept her from buying sweat pants/sweat shirt in the commissary. Whitney had to fill water bottles with hot tap water and place them under her arms and to her sides to keep warm.

45. On the April 16, 2014, medical progress note prepared by Nurse M. Jones, Whitney's blood pressure was reported as 150/100.

46. On April 17, 2014, Whitney completed a sick call request form,

complaining of a migraine since the beginning of her incarceration.

47. By this time, Dr. Williams, the Nurses, and the Officers all knew that Whitney was suffering from methadone withdrawal. The Nurses and Officers kept telling her she was faking even though she was slurring her speech, biting her tongue, and had limited control of her body. The Nurses and Officers also told Whitney to tell her mom to "quit calling here or you're going to have some problems."

48. On April 18, 2014, because Whitney complained so much, she was finally seen in the clinic. On the medical progress note prepared by Denetris Hudgins, Whitney's blood pressure was listed as 150/110. The plan was to treat her with ibuprofen and to place her on blood pressure list for three days "to watch." This plan was reviewed and signed by Dr. Arthur Williams. Dr. Williams told Whitney that her blood pressure was "elevated but not as bad as the nurse said it was yesterday."

49. According to the vitals record, Whitney's blood pressure on April 19, 2014, was reported as 130/90. Although she was supposed to be on a three day watch list, there is no blood pressure entry for April 20, 2014.

50. The Officers were correctional officers that were charged with the responsibility of monitoring, observing, and caring for Whitney on April 21, 22, and 23, 2014. Because of her soaring blood pressure had been left virtually untreated for days, Whitney began to have severe strokes and seizures that were very obvious early on April 21, 2014 and escalated in severity thereafter.

51. It was obvious to all of the Officers and Nurses that Whitney's condition was desperate on April 21, 2014 and continuing to get worse as the hours progressed. Her need for medical care throughout the days of April 21, 22, and 23, 2014 was such that it would have been obvious even to a layperson that she needed to be sent to a hospital. However, the Officers and Nurses did nothing to provide Whitney with any comfort, much less medical care. Instead, Whitney was harassed and ridiculed by the Officers and Nurses while she endured numerous strokes and seizures.

52. By the evening of April 21, 2014, Whitney's condition had become well known at the Madison County Jail. By personal observation or otherwise, numerous persons at the Jail, including the Officers and Nurses, were aware of Whitney's severe and deteriorating condition. The Officers and Nurses just watched Whitney deteriorate.

53. At approximately 7:57 p.m. on April 21, 2014, an inmate in the cell with

Whitney called for medical assistance for Whitney because she was "shaking and sweating." Whitney told Nurse Hakes that strokes ran in her family. According to the jail incident report, Nurse Hakes assessed Whitney and "decided she needed to be taken to medical for medical observation."

54. The corresponding medical progress note stated that Whitney's blood pressure was 180/110, that Whitney was "slightly lethargic," and that she was "slurring words." Whitney for the first time was given Clonidine (typically given for methadone withdrawal), and she was moved to a medical cell for observation.

55. At approximately 10:00 p.m., Nurse Sheri Hakes performed a recheck on Whitney, whose blood pressure at that time was reported to be 162/112. Nurse Hakes finally placed a call to Dr. Williams.

55.1. Officers DeShields and Nobles were on-duty on April 21, 2014. Throughout the day, they saw Whitney shaking, sweating, and knew she was having strokes and that Whitney's condition was getting worse as the hours progressed. They also knew that Whitney needed to be sent to the hospital but that the Sheriff, Morrison, ACH, the Nurses, and Dr. Williams were not going to send her to the hospital. They did nothing to provide Whitney with any comfort, much less medical care. Instead, they harassed and ridiculed Whitney while she endured numerous strokes and seizures.

55.2. Officers Maloney, Patton, Spicer, Beasley, and Joyce Williams were on-duty on April 22, 2014.

56. At approximately 6:21 a.m. on April 22, 2014, Whitney was seen by Nurse Tanya Jones, at which time Whitney's blood pressure was 160/140. Her pulse rate was 94. Under the plan section, it is noted that Whitney was prescribed Atenolol and Clonidine. This report was reviewed and signed by Dr. Williams.

57. At this point, Whitney could no longer sign her name to forms. Nor could she use the phone to dial a number, and she could not remember her charge code. Because her situation was dire, another inmate used her own charge code and helped Whitney call her mother. Whitney's speech was so slurred that all they could understand was, "Mom I'm gonna die." Whitney's mother could hear in the background people saying "quit calling your mother." Upon information and belief, these comments were made by some of the Officers and/or Nurses.

57.1 Upon information and belief, these comments were made by Officers

Maloney, Patton, Spicer, Beasley, and/or Joyce Williams.

58. During commissary, the Officers left her to lay on the ground. An inmate friend called for them to please send a nurse to come help. One of the Nurses arrived and told Whitney to "get the fu** up." Then this Nurse began picking her up and dropping her while continuing to say "get the fu** up" over and over. Some of the Nurses and Officers had to later physically put Whitney in the shower as she had urinated all over herself.

58.1 Upon information and belief, these actions and comments were made by Officers Maloney, Patton, Spicer, Beasley, and/or Joyce Williams.

59. At approximately 11:15 p.m. on April 22, 2014, another inmate requested emergency assistance for Whitney. When Officers Spicer and Beasley arrived, they found Whitney in her bunk "twitching." Whitney told them she was "hurting all over" and her "muscles keep tensing." The two officers assisted Whitney into a wheelchair and took her to triage where Nurse Maria Sanchez assessed her. Whitney's blood pressure was still at 160/140, and her pulse rate had increased to 112. Whitney slid out of the wheelchair twice and had to be helped back up by Spicer, Beasley, and Sanchez. Nurse Sanchez contacted Nurse Demetrus Johnson, who informed her to take Whitney to Old Medical Cell #4 for "Medical Observation." Whitney was not handcuffed due to her "medical condition."

59.1. Throughout April 22, 2014, Officers Maloney, Patton, Spicer, Beasley, and Joyce Williams saw Whitney shaking, sweating, and knew she was having strokes and that Whitney's condition was getting worse as the hours progressed. They also knew that Whitney needed to be sent to the hospital but that the Sheriff, Morrison, ACH, the Nurses, and Dr. Williams were not going to send her to the hospital. They did nothing to provide Whitney with any comfort, much less medical care. Instead, they harassed and ridiculed Whitney while she endured numerous strokes and seizures.

60. It was obvious to all of the Officers and Nurses that Whitney's condition was even more desperate on April 23, 2014 than it had been the day before. Her need for medical care was even more obvious to a layperson. However, the Officers and Nurses still did nothing to provide Whitney with medical care.

60.1. Officers Joyce Williams, Anderson, and King were on-duty on April 23, 2014. It was obvious to them during the early morning hours of April 23, 2014 that Whitney's condition was even more desperate than it had been the day before. They

saw Whitney shaking, sweating, and knew she was having strokes and that Whitney's condition was getting worse as the hours progressed. They also knew that Whitney needed to be sent to the hospital but that the Sheriff, Morrison, ACH, the Nurses, and Dr. Williams were not going to send her to the hospital. They did nothing to provide Whitney with any comfort, much less medical care. Instead, they harassed and ridiculed Whitney while she endured numerous strokes and seizures.

61. According to a 7:40 a.m. 4/23/14 medical progress note, Nurse Emmanuel Mbi found Whitney "lying on the floor with her upper body under the bed," stating that she could "not get out." Whitney "was assisted out but kept crawling on her back going under the bed." Whitney heard Mbi say, "there is nothing I can do with her, take her to the fu**ing hospital."

62. At some time between 7:40 a.m. and 8:20 a.m., Dr. Williams and Nurse Tanya Jones went to Whitney's cell to assess her. Dr. Williams then ordered Whitney to be sent to Huntsville Hospital emergency room for treatment "due to signs of a stroke."

63. Even then, the jail incident report states that "Nurse Mbi informed [officers] that the transportation of [Whitney] to the emergency room was a non-emergency situation." The correctional officers "handcuffed and shackled [Whitney] and escorted [her] by wheelchair to the booking area and [she] was transported to the Huntsville Hospital Emergency Room."

63.1. Officer Anderson authored the incident report.

64. Upon arrival at Huntsville Hospital at 8:50 a.m., Whitney's blood pressure was 154/131 with a heart rate of 115. She looked like she had been beaten. She was blind and partially paralyzed.

64.1. On April 24, 2014, Officer Anderson made changes to the incident report.

65. Whitney was hospitalized for three weeks. She was subsequently diagnosed with PRES (Posterior Reversible Encephalopathy Syndrome); however, her condition is no longer "reversible." Although Whitney has since regained some use of her arms and legs, the repeated strokes and seizures over numerous days resulted in permanent neurological deficits and cortical blindness.

66. Whitney's eyes are perfect, but her brain can no longer interpret the images. Whitney can only appreciate light out of the top half of her eyes, but not to her right.

What she can "see" out of the top half, however, exceeds the standards for being legally blind. Moreover, what little Whitney can perceive will always be "upside down and inside out," meaning she has no depth perception and what she perceives to be to her right is really to her left, and vice versa.

66.1. Whitney cannot read, write, take care of her child or herself. Even simple household chores are difficult; some are impossible.

67. At the time of filing, Whitney is thirty-one years old.

CAUSES OF ACTION

Count 1: Section 1983 Deliberate Indifference to Medical Needs

68. This cause of action is brought against all Defendants pursuant to 42 U.S.C. § 1983. Whitney incorporates by reference all factual allegations in the preceding paragraphs.

69. Whitney suffered from a medical need that posed a substantial risk of serious harm. Whitney's condition was so obvious that even a lay person would easily recognize the necessity for attention and hospital treatment. Furthermore, even a lay person would have known that, if left unattended, Whitney's condition rendered her exposed to a substantial risk of serious injury, harm, and/or death.

70. Dr. Williams, the Nurses, Morrison, and the Officers all subjectively knew that Whitney suffered from a serious medical need and that she was unable to get medical attention for herself. They also subjectively knew that the failure to get treatment for Whitney's condition would result in serious injury, harm, and/or death. They were not only aware of facts from which these conclusions could be drawn, they in fact each subjectively drew such conclusions. Nevertheless, they disregarded the risk to Whitney, and in so doing they acted with more than gross negligence.

71. Whitney's serious medical needs were ignored, in part, because of the deliberately indifferent customs or policies of Madison County, Dorning, Morrison, ACH, and Dr. Williams to the serious medical needs of prisoners in the Madison County Jail. The actions of the Officers, the Nurses, and Dr. Williams themselves indicate systemic breaches of fundamental standards of correctional management and correctional health care. Their actions are also themselves indicative of inadequate policies and practices and inadequate training and supervision. Madison County, Dorning, Morrison, ACH, and Dr. Williams subjectively knew that the failure to get

treatment for the serious medical needs and conditions of detainees and jailees would result in serious injury, harm, and/or death. They were not only aware of facts from which these conclusions could be drawn, they in fact each subjectively drew such conclusions. Nevertheless, they disregarded the risk to the detainees/jailees at the Madison County Jail, including Whitney, and in so doing they acted with more than gross negligence.

72. As a direct and proximate result of the combining and concurring unconstitutional conduct of all of Defendants, Whitney was not timely and appropriately tested, diagnosed or treated for high blood pressure, her condition deteriorated due to the lack of timely and appropriate treatment, and she suffered PRES Syndrome, which resulted in permanent neurological deficits and cortical blindness. As a result, Whitney is essentially permanently and totally disabled.

73. As a further direct and proximate result of the combining and concurring negligent conduct of Defendants, Whitney has been caused to lose wages and benefits, and she has also been caused to lose future earning capacity. Whitney has also been caused to suffer great physical pain and suffering in the past, and she will also suffer such great physical pain and suffering in the future. Whitney has been caused to undergo serious and painful medical care and treatment and to incur expense in the past, and Whitney will also be caused to undergo such serious and painful medical care and treatment and incur such expenses in the future. Whitney has suffered great mental anguish, annoyance, and embarrassment in the past, and she will suffer more mental anguish, annoyance, and embarrassment in the future. Whitney has been permanently injured and permanently disfigured and will remain in this state and dependent on other persons for the rest of her life. She has suffered permanent damage and will always suffer from a reduced quality of life.

74. To be clear, Madison County is only sued under this count for its deliberate indifference to the constitutional rights of detainees/jailees at the Madison County Jail by its policy of funding as described above.

75. All Defendants acted with malice and/or with reckless disregard for Whitney's constitutional rights and her health and safety.

WHEREFORE, PREMISES CONSIDERED, Whitney respectfully requests this Honorable Court (1) to enter judgment against Defendants, (2) to award Whitney compensatory damages from Defendants in an amount determined by the jury, (3) to award Whitney punitive damages from Defendants (except Madison County) in an amount determined by the jury, (4) to award Whitney attorneys' fees and expert

witness fees from Defendants, (5) to award Whitney court costs and interest from Defendants, and (6) to award Whitney other relief as the Court deems just and proper.

<u>Count 2: Section 1983 Conspiracy to Violate Civil Rights</u>

76. This cause of action is brought against Madison County, Dorning, Morrison by and through Morrison, ACH, and Dr. Williams pursuant to 42 U.S.C. § 1983. Whitney incorporates by reference all factual allegations in the preceding paragraphs.

77. A conspiracy existed between Madison County, Dorning, Morrison, ACH, Dr. Williams, and others that resulted in the actual denial of Whitney's constitutional right to medical care for her serious medical needs. These Defendants and others reached an understanding to deny detainees and jailees in the Madison County Jail of such rights as set forth above.

78. As a direct and proximate result of this conspiracy to violate the civil rights of the detainees/jailees at the Madison County Jail, Whitney was injured and damaged as stated above.

WHEREFORE, PREMISES CONSIDERED, Whitney respectfully requests this Honorable Court (1) to enter judgment against Madison County, Dorning, Morrison by and through Morrison, ACH, and Dr. Williams, (2) to award Whitney compensatory damages from these Defendants in an amount determined by the jury, (3) to award Whitney punitive damages from these Defendants (except Madison County) in an amount determined by the jury, (4) to award Whitney attorneys' fees and expert witness fees from these Defendants, (5) to award Whitney court costs and interest from these Defendants, and (6) to award Whitney other relief from these Defendants as the Court deems just and proper.

<u>Count 3: Negligent Medical Malpractice</u>

79. This cause of action is asserted against ACH, Dr. Williams, and the Nurses pursuant to the Alabama common law tort of negligence as modified by the Alabama Medical Liability Acts, Ala. Code §§ 6-5-480, et seq. ("AMLA"). Whitney incorporates by reference all factual allegations in the preceding paragraphs.

80. ACH, its supervisors, and its employees (including Dr. Williams and the Nurses) had a duty to follow the standard of reasonable care, skill, and diligence in their care and treatment of Whitney that is used by similarly situated health care providers in the same general line of practice.

81. ACH, its supervisors, and its employees (including Dr. Williams and the Nurses) negligently breached that duty by: (a) failing to timely diagnose and treat Whitney's high blood pressure; (b) ordering insufficient medical care for Whitney; (c) ordering inappropriate medical treatment for Whitney; (d) failing to timely and appropriately have Whitney tested, diagnosed and treated, at a hospital or other appropriate facility or otherwise, for dangerously elevated blood pressure; (e) failing to diagnose and properly treat Whitney's methadone withdrawal; (f) failing to transport Whitney to a hospital when her symptoms clearly showed she was experiencing a medical emergency; (g) failing to diagnose and/or treat Whitney for the warning signs of a stroke, (h) failing to diagnose and/or treat Whitney for the warning signs of a stroke; and (i) failing to have a care plan in place and failing to change that care plan with each change of medical status.

82. As a direct and proximate result of the combining and concurring negligent malpractice of ACH, its supervisors, and its employees, including Dr. Williams and the Nurses (and the combining and concurring wrongful conduct of the other Defendants), Whitney was injured and damaged as stated above.

83. Defendant ACH is vicariously liable for the negligent conduct of its supervisors, and its employees (including Dr. Williams and the Nurses) under the doctrines of respondeat superior, apparent agency, nondelegable duties, and other doctrines.

WHEREFORE, PREMISES CONSIDERED, Whitney respectfully requests this Honorable Court (1) to enter judgment against ACH, Dr. Williams, and the Nurses, (2) to award Whitney compensatory damages from these Defendants in an amount determined by the jury, (3) to award Whitney court costs and interest from these Defendants, and (4) to award Whitney other relief from these Defendants as the Court deems just and proper.

Count 4: Negligent Correctional Care

84. This cause of action is asserted against Madison County and the Officers pursuant to the Alabama common law tort of negligence as modified by statutes of the Alabama Legislature. Whitney incorporates by reference all factual allegations in the preceding paragraphs.

85. Madison County negligently funded the Madison County Jail for the reasons stated above.

86. The Officers negligently, carelessly, and/or unskillfully assessed Whitney. They knew or should have known that Whitney needed medical attention. However, they negligently (a) monitored Whitney, (b) ignored Whitney's medical needs, (c) placed too much reliance on ACH and its supervisors and employees, and/or (d) delayed and denied Whitney treatment.

87. The Officers did not "act in compliance with law" under the meaning of Ala. Code § 14-6-1 because they not only violated the U.S. Constitution (as stated above), they also violated Ala. Code § 14-6-19 by failing to provide Whitney with medical care for her serious medical needs. The Officers also did not "act in compliance with law" under Ala. Code § 14-6-1 because they acted beyond their authority by failing to follow nondiscretionary orders, rules, regulations, statutes, checklists, and/or policies of the State of Alabama, of Madison County, and/or of the Madison County Sheriff. For these same reasons, the Officers are not entitled to State-agent immunity.

88. As a direct and proximate result of the combining and concurring negligent correctional care of Madison County and the Officers (and the combining and concurring wrongful conduct of the other Defendants), Whitney was injured and damaged as stated above.

WHEREFORE, PREMISES CONSIDERED, Whitney respectfully requests this Honorable Court (1) to enter judgment against Madison County and the Officers, (2) to award Whitney compensatory damages from these Defendants in an amount determined by the jury, (3) to award Whitney court costs and interest from these Defendants, and (4) to award Whitney other relief from these Defendants as the Court deems just and proper.

Count 5: Wantonness

89. This cause of action is asserted against all Defendants (except Dorning and Morrison) pursuant to the Alabama common law tort of wantonness as modified by statutes of the Alabama Legislature. Whitney incorporates by reference all factual allegations in the preceding paragraphs.

90. By consciously doing and/or not doing the acts set-forth above, Defendants subjectively knew that injury would likely or probably result to Whitney or someone in a substantially similar position. Their conduct was wanton, reckless, and oppressive.

91. As a direct and proximate result of the combining and concurring wanton

conduct of Defendants, Whitney was injured and damaged as stated above.

92. Defendant ACH is vicariously liable for the wanton conduct of its supervisors, and its employees (including the above-stated nurses and Dr. Williams) under the doctrines of respondeat superior, apparent agency, nondelegable duty and other doctrines.

WHEREFORE, PREMISES CONSIDERED, Whitney respectfully requests this Honorable Court: (1) to enter judgment against these Defendants, (2) to award her compensatory damages in an amount to be determined by a jury; (3) to award her punitive damages to punish these Defendants for their wrongful conduct and to deter these Defendants and others from committing the same or similar wrongful conduct, (4) to award her court costs and interest as allowed by law, and (5) to award her all other relief as the Court deems just and proper.

Count 6: Civil Conspiracy

93. This cause of action is asserted against all Madison County, ACH, and Dr. Williams pursuant to the Alabama common law tort of conspiracy as modified by statutes of the Alabama Legislature. Whitney incorporates by reference all factual allegations in the preceding paragraphs.

94. A conspiracy existed between Madison County, ACH, Dr. Williams, and others that resulted in the actual denial of Whitney's constitutional right to medical care for her serious medical needs. These Defendants and others reached an understanding to deny detainees and jailees in the Madison County Jail of such rights as set forth above.

95. As a direct and proximate result of this conspiracy to violate Whitney's civil rights, Whitney was injured and damaged as stated above.

WHEREFORE, PREMISES CONSIDERED, Whitney respectfully requests this Honorable Court (1) to enter judgment against Madison County, ACH, and Dr. Williams, (2) to award her compensatory damages against Madison County, ACH, and Dr. Williams in an amount to be determined by a jury, (3) to award her punitive damages against ACH, and Dr. Williams in an amount to be determined by a jury to punish them for their wrongful conduct and to deter them and others from committing the same or similar wrongful conduct, (4) to award her court costs and interest as allowed by law, and (5) to award her all other relief as the Court deems just and proper.

Jury Demand

96. Whitney requests a trial by struck jury on all issues of fact, including the amount of damages.

Respectfully submitted by
the Attorneys for Whitney Elizabeth Foster

/s/ Richard Riley
David Marsh, Rip Andrews, Richard Riley, Hank Sherrod

MARSH, RICKARD & BRYAN P.C.          HENRY F. SHERROD III P.C.
800 Shades Creek Pkwy.; Ste. 600D    119 South Court Street
Birmingham, Alabama 35209            Post Office Box 606
Ph: (205)879-1981                    Florence, Alabama 35631-0606
Fx: (205)879-1986                    Ph: (256)710-7983
Em: rriley@mrblaw.com                Fx: (877)684-0802
                                     Em: hank@alcivilrights.com

Certificate of Filing and Service

On June 8, 2017, I electronically filed the foregoing using the CM/ECF System, which will electronically serve true and exact electronic copies on the persons stated below at the stated email addresses:

Christie J. Strange Esq. (cjs@phm-law.com)
David J. Canupp Esq. (djc@lfsp.com)
George W. Royer Jr. Esq. (gwr@lanierford.com)
Horace Cecil Ireland III Esq. (ireland@phm-law.com)
John P. Burbach Esq. (jburbach@sirote.com)
L. Franklin Corley IV Esq. (fcorley@sirote.com)
H. Harold Stephens Esq. (hstephens@babc.com)
Harold D. Mooty III Esq. (hmooty@babc.com)
T. Kelly May Esq. (kmay@huielaw.com)
Hugh Cannon Lawley Esq. (cannon@huielaw.com)
Jennifer H. Reid Esq. (jreid@huielaw.com)
Hank Sherrod Esq. (hank@alcivilrights.com)

/s/ Richard Riley
Richard Riley