# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **WHITNEY ELIZABETH FOSTER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:16-cv-00521-MHH** |
| | } | |
| **ADVANCED CORRECTIONAL** | } | |
| **HEALTHCARE, INC., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This case is before the Court on three motions to dismiss filed by various defendants. While incarcerated at the Madison County Jail, plaintiff Whitney Foster alleges that she did not receive adequate treatment for many severe health problems. She eventually was hospitalized and now suffers from permanent neurological deficits and cortical blindness. In her amended complaint, Ms. Foster asserts claims of deliberate indifference to medical needs under 42 U.S.C. § 1983, conspiracy to violate civil rights under 42 U.S.C. § 1983, negligent medical practice, negligent correctional care, wantonness, and civil conspiracy. (Doc. 60, pp. 16, 18-21).

In her amended complaint, Ms. Foster names as defendants Advanced Correctional Healthcare, Inc. ("ACH"), the corporation contracted to provide

1

healthcare to inmates residing in the Madison County Jail; Dr. Arthur Williams, a physician at Madison County Jail; specific nurses at the jail ("the nurses");[1] Madison County; Blake Dorning, the Madison County Sheriff; Jerry Morrison as the personal representative of the estate of Steve Morrison, the Jail Administrator ("Mr. Morrison"); and specific correctional officers at the jail ("the correctional officers").[2] (Doc. 60, pp. 1-3).

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Madison County asks the Court to dismiss the claims of negligent correctional care, wantonness, and civil conspiracy asserted against it. (Doc. 62, p. 1). The correctional officers ask the Court to dismiss the § 1983 and tort claims asserted against them. (Doc. 84, p. 1). Mr. Morrison asks the Court to dismiss the § 1983 claims asserted against the estate of Steve Morrison. (Doc. 86, p. 1). For the following reasons, the Court grants in part and denies in part Madison County's motion to dismiss and denies both the correctional officers' and Mr. Morrison's motions to dismiss.

## I. STANDARD OF REVIEW

Rule 12(b)(6) enables a defendant to move to dismiss a complaint for

---

[1] The nurses are Emmanuel Mbi, Tanya Jones, Sherri Hakes, Maria Sanchez, Demetrius Johnson, Denetris Hudgins, Mary Jones, Michelle Kirk, C. Ashley, and D. Smith. (Doc. 60, ¶ 6).

[2] The correctional officers are Cassie Maloney, Joyce Williams, Benzilla Anderson, Mildred Patton, Sheree King, Charity Beasley, Shelby Spicer, Felicia DeShields, and Emily Nobles. (Doc. 60, ¶ 11).

"failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint against the "liberal pleading standards set forth by Rule 8(a)(2)." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Pursuant to Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007)).

In deciding a Rule 12(b)(6) motion to dismiss, a court must view the allegations in a complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). A court must accept well-pled facts as true. *Grossman v. Nationsbank*, *N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000).

## II. FACTUAL BACKGROUND

The factual allegations in the amended complaint, viewed in the light most favorable to Ms. Foster, indicate that pursuant to its contract with Madison County, ACH provides healthcare services to inmates at the Madison County Jail. (Doc.

60, ¶¶ 15, 17). The contract caps outside medical care costs at $200,000 per quarter. (Doc. 60, ¶ 17). The contract permits ACH to keep as profit the difference between the $200,000 cap and actual outside medical care costs incurred in a quarter when those costs fall below $200,000. (Doc. 60, ¶ 17). According to Ms. Foster, this contract provision incentivized ACH to deny prison inmate referrals to outside medical care providers as a cost controlling mechanism, the "result of which [was] unnecessary inmate suffering." (Doc. 60, ¶ 17).[3]

Ms. Foster alleges that ACH personnel refused to refer inmates for outside care when necessary, failed to respond to or evaluate inmates' serious medical needs, and let inmates' health deteriorate. (*See* Doc. 60, ¶ 30). She also alleges that Sheriff Dorning and Mr. Morrison encouraged correctional officers to defer to ACH personnel for medical decisions even though the officers were aware that ACH's medical care endangered inmates because ACH elevated cost control over healthcare. (Doc. 60, ¶¶ 22-23, 25). Ms. Foster asserts that at least six inmates died due to the failure of ACH and correctional personnel to provide inmates with

---

[3] The contract was amended five weeks prior to Ms. Foster's incarceration to provide that the difference, if any, between the $200,000 cap and actual outside medical care costs incurred in a quarter would be returned to Madison County. (Doc. 60, ¶ 17.1). Neither Sheriff Dorning, Madison County, ACH, Dr. Williams, nor Mr. Morrison notified nurses or officers of the contract change, thereby allegedly allowing the inadequate medical care policies to continue. (Doc. 60, ¶ 17.1).

basic medical care.[4]  (Doc. 60, ¶¶ 24, 28).  Ms. Foster alleges that no defendant investigated the circumstances of these deaths, nor did the defendants investigate grievances regarding medical care.  (Doc. 60, ¶¶ 27-28).

Ms. Foster was arrested and booked at Madison County Jail on April 4, 2014.  (Doc. 60, ¶ 31).  Before her arrest, she had been taking 80 mg of methadone daily.  The methadone was administered by a methadone clinic.  (Doc. 60, ¶ 35).  Once incarcerated, Ms. Foster alleges that she "began to show visible signs of being weak and suffering from methadone withdrawal."  (Doc. 60, ¶ 38).  The visible symptoms grew more severe each day, although the defendants "did nothing to help her."  (Doc. 60, ¶ 38).

Ms. Foster experienced elevated blood pressure on numerous occasions.  (Doc. 60, ¶¶ 39, 41).  On April 6, 2014, nurses placed her on vistaril and dicyclomine, as was "protocol for withdrawal patients."  (Doc. 60, ¶ 40).  Nurses did not write down multiple blood pressure readings "in the 200s."  (Doc. 60, ¶ 42.1).  Nurses and correctional officers accused Ms. Foster of faking when she slurred her speech, bit her tongue, and exhibited limited control of her body.  (Doc.

---

[4] Regarding three of the deaths in 2013, "[a]ll three inmates died when ACH and Madison County Jail personnel refused to send them to the hospital.  In all three cases, correctional officers deferred to ACH medical personnel even though (1) it was obvious to a layperson that the inmate needed to be sent to a hospital for evaluation and treatment and (2) it was obvious to the correctional officers that ACH was doing nothing for the detainee/jailee." (Doc. 60, p. 7, ¶ 24).  *See Elliott v. Madison Cnty., et al*, Case No. 5:14-cv-1309 (Smith); *Jefferson v. Madison Cnty., et al*, Case No. 5:14-cv-1959 (Kallon); *Woods v. Madison Cnty., et al*, Case No. 5:14-cv-1964 (Bowdre).

60, ¶ 47).  Ms. Foster was seen in the clinic on April 18, 2014, given ibuprofen, and put on three day blood pressure watch.  (Doc. 60, ¶ 48).

On April 21, 2014, Ms. Foster began having strokes and seizures, during which she was harassed and ridiculed by officers and nurses.  (Doc. 60, ¶¶ 50-51).  She was found shaking and sweating, with a blood pressure of 180/110, slightly lethargic, and slurring her words.  (Doc. 60, ¶¶ 53-54).  She was given clonidine, apparently for methadone withdrawal.  (Doc. 60, ¶ 54).  The next day, Ms. Foster called her mom and told her with slurred speech that she was going to die.  (Doc. 60, ¶ 57).  Ms. Foster was left to lie on the ground, and a nurse picked her up and dropped her, saying "get the fu** up."  (Doc. 60, ¶ 58).  Some officers and nurses put Ms. Foster in the shower because she urinated on herself.  (Doc. 60, ¶ 58).

On April 22, 2014, correctional officers saw Ms. Foster shaking and sweating.  Ms. Foster alleges that the officers knew she was having strokes.  (Doc. 60, ¶ 59.1).  Ms. Foster asserts that the officers knew she had to be sent to the hospital, but no defendant would send her to the hospital.  (Doc. 60, ¶ 59.1).  The officers harassed and ridiculed her throughout the day.  (Doc. 60, ¶ 59.1).  That night, officers found Ms. Foster twitching in her bunk, complaining of hurting all over and tensing muscles.  (Doc. 60, ¶ 59).

On the morning of April 23, 2014, a nurse could not pull Ms. Foster out from under a bed.  (Doc. 60, ¶ 61).  Dr. Williams ordered that Ms. Foster be sent to

the Huntsville Hospital emergency room due to signs of a stroke. (Doc. 60, ¶ 62).

When Ms. Foster arrived at the hospital, her blood pressure was 154/131, she had a

heart rate of 115, she looked like she had been beaten, she was blind, and she was

partially paralyzed. (Doc. 60, ¶ 64).

Ms. Foster remained hospitalized for three weeks and was diagnosed with

Posterior Reversible Encephalopathy Syndrome; Ms. Foster contends her condition

is no longer reversible. (Doc. 60, ¶ 65). Ms. Foster has some use of her arms and

legs, but the repeated strokes and seizures caused permanent neurological deficits

and cortical blindness. (Doc. 60, ¶ 65).

## III. DISCUSSION

### A. Madison County's Partial Motion to Dismiss State Law Tort Claims

Madison County asks the Court to dismiss the state law tort claims (civil

conspiracy, negligent correctional care, and wantonness) that Ms. Foster asserts

against it.[5] (Doc. 62, p. 1). Madison County argues that Ms. Foster failed to

comply with Alabama law requiring proper pre-suit notice before bringing an

---

[5] The amended complaint contains more than these three claims against Madison County. Ms. Foster also brings deliberate indifference to medical needs and conspiracy to violate civil rights claims under § 1983 against Madison County. (Doc. 60, ¶¶ 68, 76). Madison County recognizes this and requested dismissal at one point: "To the extent that the [amended complaint] can be read to assert that Madison County violated the civil rights of the plaintiff . . . it is due to be dismissed." (Doc. 62, ¶ 3). Madison County also disputes the § 1983 allegations in its brief in support of its partial motion to dismiss before reiterating the same request for dismissal. (Doc. 63, pp. 7-9). However, Madison County states that it "has not moved to dismiss plaintiff's § 1983 claim and that issue is not currently before the Court." (Doc. 91, p. 2). Accordingly, despite Madison County's initial requests and briefing, the Court will address only Madison County's requests to dismiss the three state law tort claims.

actionable claim against a county.

### 1. Civil conspiracy claim against Madison County

Madison County raises a procedural challenge to Ms. Foster's conspiracy claim. Under Alabama law, before a plaintiff may sue a county, the plaintiff must present a notice of claim to the county within 12 months after accrual of the claim. Ala. Code § 11-12-8 (1975). This notice must be "itemized." Ala. Code § 11-12-5. The plaintiff cannot file suit until the county denies the claim or the claim is denied by operation of law after 90 days. Ala. Code § 6-5-20. Ms. Foster presented Madison County her notice of claim within 12 months of accrual of the claim. (Doc. 63, p. 22). The claim was denied by operation of law after 90 days. (Doc, 70, p. 19). Madison County argues that the notice is not properly itemized because it omits a theory of liability asserted in the amended complaint.

The itemization requirement in § 11-12-5 provides a county "with notice of claims against the county and an opportunity to audit and investigate the claims." *Elmore Cnty. Comm'n v. Ragona*, 540 So. 2d 720, 723 (Ala. 1989). The "items" should include "a factual background, a description of the event or transaction giving rise to the claim, the alleged basis for the county's liability for damages resulting from the event or transaction, the nature of the damages, and the compensation demanded." *Id.* Minor deficiencies in a notice of claim are not fatal if they do not "prevent the [county] from having adequate notice of the claims

against it and an opportunity to audit and investigate the claims." *Helms v. Barbour Cnty.*, 914 So. 2d 825, 830 (Ala. 2005) (internal quotation marks omitted) (notice was properly itemized for asserting substantially similar, but not identical, theories of liability as the complaint); *see Ragona*, 540 So. 2d at 723 (notice signed by an attorney without personal knowledge complied with the § 11-12-5 "personal knowledge" requirement).

Madison County argues first that Ms. Foster's notice is inadequate because it does not mention the conspiracy claim that Ms. Foster asserts in the amended complaint. Ms. Foster contends that she sufficiently placed Madison County on notice of her conspiracy claim because her conspiracy claim "derive[s] directly from the underlying wrongs." (Doc. 70, p. 22). The Alabama Court of Civil Appeals rejected a similar argument in *Jacks v. Madison Cnty.*, 741 So. 2d 429 (Ala. Civ. App. 1999). In *Jacks*, the plaintiff's complaint contained counts of breach of contract, fraudulent misrepresentation, trespass, and nuisance against a county that built a water storage tank and road on the plaintiff's property, but the plaintiff's pre-suit notice only identified a breach of contract claim. Although the trespass and nuisance claims arose from the same events as the breach of contract, the Court of Civil Appeals found that the "[plaintiff's] failure to present her nuisance and trespass claims to the county barred her assertion of those theories in her complaint." *Id.* at 434. Similarly, in this case, Ms. Foster's notice mentions

negligence and wantonness consistent with the claims in her amended complaint, but the notice does not mention conspiracy. Accordingly, the notice fails to meet the § 11-12-5 itemization requirement for lack of an "alleged basis for the county's liability." *Ragona*, 540 So. 2d at 723. Therefore, the Court grants Madison County's motion to dismiss the civil conspiracy claim.

2. <u>Negligence and wantonness claims against Madison County</u>

The County's challenge to Ms. Foster's negligence and wantonness claims also concerns her pre-suit notice. Madison County argues that Ms. Foster cannot state claims for negligence and wantonness because Ms. Foster's notice "does not address, in any way, Madison County's duty to fund the jail." (Doc. 63, p. 12). The parties agree that the County's only duty with respect to the jail is to fund the operation of the jail, but disagree on the consequences of omitting that specific factual allegation from the notice. The Court finds that the omission does not prevent Ms. Foster from stating claims of negligence and wantonness.

While Ms. Foster's notice did not accurately identify the duty Madison County breached, it did identify bases of liability. Section 11-12-5 and the Supreme Court of Alabama require only the latter. In *Helms*, the plaintiffs' pre-suit notice identified a trespass claim with the language, "During the scraping process the [defendant's] grader went outside of the established right-of-way and came upon the property of the claimants. This caused the long leaf pines to be

destroyed." 914 So. 2d at 830. The notice identified an improper taking claim with the language, "[T]his further caused the right-of-way to be expanded without the consent of the property owners and without compensation to the property owners." *Id.* The Supreme Court of Alabama found that "the bases for the County's liability as stated in [the plaintiffs' pre-suit notice] are substantially the same as those stated in their complaint." *Id.*

Similarly, Ms. Foster states substantially the same bases of liability in her notice and in her amended complaint. In her notice, she claims she is entitled to damages because:

> Madison County Jail, and its agents and/or employees had a statutory duty under Alabama law to attend to the medical needs of inmates in the Madison County Jail. Those agents and/or employees were negligent, wanton, and/or breached the standard of care in meeting Foster's medical needs, specifically including for headache, confusion, slurred speech, high blood pressure, TIA and stroke.
>
> As a proximate consequence of said negligent or wanton conduct of the aforesaid parties, Whitney Elizabeth Foster, was caused to suffer encephalopathy due to PRESS syndrome, cortical blindness, and other physical injuries.

(Doc. 63, p. 22). In count four and count five of her amended complaint, Ms. Foster brings claims for negligent and wanton care at the hands of agents and/or employees of Madison County Jail, consistent with the claims in her notice. (Doc. 60, pp. 3-20). Madison County did not have to "'presume' certain claims may be brought against it." (Doc. 91, p. 6). Rather, Ms. Foster told Madison County

precisely which claims she might bring.

Madison County argues that the notice is invalid because Madison County is not obligated to attend to the medical needs of inmates, yet the notice states, "Madison County Jail . . . had a statutory duty under Alabama law to attend to the medical needs of inmates . . . ." (Doc. 91, pp. 3-4). Section 11-12-5 does not require that the complainant state the particular duty a county breached. Rather, it requires the complainant allege a basis of liability. Arguably misstating the County's duty when the basis of liability is otherwise properly alleged still satisfies the purpose of § 11-12-5 by giving the County "notice of claims against [it] and an opportunity to audit and investigate the claims." *Ragona*, 540 So. 2d at 723. The notice informed the County of the particular tort claims, the general setting and events giving rise to the claims, and the source of the alleged negligence and wantonness, namely "agents and/or employees" of the County. (Doc. 63, p. 22). Even if misstating the duty is a deficiency, it is minor, and the County "[can] not complain that relatively minor deficiencies in claims prevent [it] from acquiring knowledge of actions pending against [it]." *Id.* (citing *Diemert v. City of Mobile*, 474 So. 2d 663, 666 (Ala. 1985)).

In support of its argument that Ms. Foster's notice is deficient, Madison County relies on three cases. The first is *Ford v. Jefferson County*, 774 So. 2d 600 (Ala. Civ. App. 2000). (Doc. 63, pp. 12-13, Doc. 91, pp. 6-7). The facts of *Ford*

are irrelevant to this case. In *Ford*, the plaintiffs filed no pre-suit notice at all, and unsuccessfully argued that filing a complaint in court satisfies the pre-suit notice obligation. *Ford*, 774 So. 2d at 605. *Ford* is not a case evaluating the sufficiency of an itemization in an otherwise compliant notice and thus is not persuasive in the context of this case.

Second, Madison County relies on *Jacks* to argue that Ms. Foster's notice requires the County to presume potential claims may be brought against it. (Doc. 91, p. 6). Also, Madison County argues that Ms. Foster's notice lacks an alleged claim like the deficient notice in *Jacks*. (Doc. 63, p. 12). However, in *Jacks*, the pre-suit notice did not identify the trespass or nuisance claims alleged in the complaint. *Jacks*, 741 So. 2d at 434. The issue in *Jacks* is the complete omission of claims, not the proper itemization of claims. Ms. Foster did not completely omit the theories of negligence and wantonness, so Madison County's reliance on *Jacks* is misplaced.

Finally, Madison County heavily relies on *Kelly v. Owens, et al.*, 2006 WL 3421257 (M.D. Ala. Nov. 28, 2006). In *Kelly*, the plaintiff claimed that he received inadequate medical treatment while incarcerated at the Coosa County Jail. The only relevant portion of the plaintiff's pre-suit notice stated, "Coosa County had undertaken and hired medical personnel, including the services of a physician, to provide medical services to inmates at Coosa County Jail." *Kelly*, 2006 WL

13

3421257 at *7.  In the related section of the complaint, the plaintiff alleged that Coosa County breached the "duty [to provide necessary medicines and medical attention to sick and injured inmates] by inadequate funding in a manner which injured [the plaintiff] . . . .  [T]he funding for medical care for prisoners was inadequate such that plaintiff did not receive adequate medical care." *Id.*  The district court concluded that the notice "cannot be construed as sufficient to notify the Commission of a negligent failure to fund claim." *Id.* (citations omitted).  The pre-suit notice did not "attribute to the Commission any non-compliance with its statutory funding duty, either in general or specific terms," such that "the Commission had no reason to believe any subsequent lawsuit would specify this as a basis of liability." *Id.* at *8.  The district court held:

> Where a pre-lawsuit Notice of Claim describes the nature of the liability claim in a manner which expressly rejects a particular theory of recovery against the Commission, as did Kelly's Notice, the Commission is entitled to rely on that disclosure as it investigates and considers the merits of the claim.  Consequently, Rule 12(b)(6) dismissal is warranted if the subsequent lawsuit purports to assert a theory of liability which contradicts directly the specific facts reported in the claim.

*Id.*

In contrast, Ms. Foster attributes negligence and wantonness to Madison County, both in her notice and in her amended complaint.  Her notice describes Madison County's failure to provide adequate medical care to inmates as does her complaint.  Unlike the notice in *Kelly*, nothing in Ms. Foster's notice "expressly

rejects a particular theory of recovery" asserted in her complaint, nor does her complaint "contradict[] directly the specific facts reported in the [notice]." *Id.* Therefore, the pre-suit notice in *Kelly* is distinguishable from Ms. Foster's notice.

Ms. Foster's notice is comparable to the satisfactory notice in *Helms* because the notice offers bases of liability "substantially the same as those stated in [her] complaint." *Helms*, 914 So. 2d at 830. Just as it focused on the purpose of § 11-12-5 in *Ragona*, the Supreme Court of Alabama found in *Helms* that the "relatively minor" discrepancies "did not prevent the Commission from having adequate notice of the claims against it and an opportunity to audit and investigate the claims." *Id.* (internal quotation marks omitted). As previously discussed, the discrepancies in Ms. Foster's notice are minor because the bases of liability in the notice and amended complaint are substantially the same. Although she did not specifically identify the County's duty to fund the jail in her notice, this is not fatal under *Helms*. Therefore, the Court denies Madison County's motion to dismiss Ms. Foster's negligent correctional care and wantonness claims.

### B. The Correctional Officers' Motion to Dismiss All Claims

The correctional officers ask the Court to dismiss the § 1983, negligent correctional care, and wantonness claims that Ms. Foster asserts against them. (Doc. 84, p. 1). The officers argue that Ms. Foster failed to state a claim under Rule 12(b)(6) and that the officers are entitled to qualified and state law immunity.

(Doc. 84, p. 1).

         1. <u>§ 1983 deliberate indifference to medical needs claim against the correctional officers</u>

The correctional officers assert that qualified immunity precludes Ms. Foster's § 1983 claim against them. (Doc. 84, ¶ 14). Qualified immunity is a complete immunity from suit rather than a defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity protects governmental officials who are sued under 42 U.S.C. § 1983 in their individual capacities if their conduct "violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity attaches unless "a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818). As the Supreme Court has explained:

> A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. ----, ----, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

A plaintiff can establish that the law put an official on fair notice of unlawfulness in multiple ways:

> *First*, the plaintiffs may show that a materially similar case has already been decided. *Second*, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. *Finally*, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary. Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant State Supreme Court].

*Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (alteration and emphasis in original) (quoting *Terrell v. Smith*, 668 F.3d 1244, 1255-56 (11th Cir. 2012)).

Recently, the United States Supreme Court discussed the concept of "clearly established law." In *White v. Pauly*, 137 S. Ct. 548 (2017) (per curiam), a police officer was accused of using excessive force in violation of the Fourth Amendment when he arrived late to a crime scene and shot and killed an armed occupant of a house without first giving a warning. Affirming the district court's denial of qualified immunity to the officer on a motion for summary judgment, the Court of Appeals for the Tenth Circuit found that the rule requiring that the police officer give a warning despite the threat of serious harm was clearly established at the time of the shooting. *Id.* at 551. The Supreme Court reversed the decision because

the Court of Appeals "relied on general statements from [Supreme Court] case law that (1) 'the reasonableness of an officer's use of force depends, in part, on whether the officer was in danger at the precise moment that he used force' and (2) 'if the suspect threatens the officer with a weapon[,] deadly force may be used if necessary to prevent escape, and if[,] where feasible, some warning has been given." *Id.* (alterations in original) (citing *Pauly v. White*, 814 F.3d 1060, 1083 (10th Cir. 2016), *cert. granted, judgment vacated*, 137 S. Ct. 548 (2017)).[6]

The Supreme Court held that in the absence of "a case where an officer acting under similar circumstances as [the officer at issue] was held to have violated the Fourth Amendment," the existing general statements about use of

_____

[6] According to the Supreme Court, the Tenth Circuit Court of Appeals drew the two statements from *Graham v. Connor*, 490 U.S. 386 (1989), *Tennessee v. Garner*, 471 U.S. 1 (1985), and "their Court of Appeals progeny." *White*, 137 S. Ct. at 552. The Supreme Court distinguished the facts of *White* from *Graham* and *Garner*, saying:

> [W]e have held that *Garner* and *Graham* do not by themselves create clearly established law outside "an obvious case." *Brosseau v. Haugen*, 543 U.S. 194, [199] (2004) (per curiam); *see also Plumhoff v. Rickard*, [134 S.Ct. 2012, 2023] (2014) (emphasizing that *Garner* and *Graham* "are 'cast at a high level of generality'").
>
> . . . .
>
> This is not a case where it is obvious that there was a violation of clearly established law under *Garner* and *Graham* . . . . [The Court of Appeals] recognized that this case presents a unique set of facts and circumstances in light of White's late arrival on the scene. This alone should have been an important indication to the majority that White's conduct did not violate a clearly established right.

*Id.* (citation and internal quotation marks omitted).

deadly force did not clearly establish law prohibiting "a reasonable officer who arrives late to an ongoing police action in circumstances like this from assuming that proper procedures, such as officer identification, have already been followed."[7] *Id.* Although "'general statements of the law are not inherently incapable of giving fair and clear warning'" to officers, the general statements on which the Court of Appeals relied did not make the unlawfulness of the officer's actions apparent. *Id.* (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). *White* reinforces that, as the Supreme Court has required for decades, the "clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Gaines*, 871 F.3d at 1214 (finding that reliance upon case law "not particularized to the facts of the case, but rather … merely setting out First Amendment principles at a high level of generality" could not support a finding of qualified immunity).

Mindful of *White* and *Gaines*, the Court turns to Ms. Foster's allegations against the correctional officers. Ms. Foster alleges that the officers violated her

---

[7] The correctional officers argue that *White* requires that a plaintiff identify a prior case in which officers acting under similar circumstances were held to have violated a constitutional right in order to satisfy the "clearly established" qualified immunity prong. (Doc. 84, ¶ 15; Doc. 85, p. 23). *White* contradicts the officers' interpretation: "While this Court's case law 'do[es] not require a case directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" 137 S. Ct. at 551 (alteration in original) (quoting *Mullenix*, 136 S. Ct. at 308).

constitutional right to be free from deliberate indifference to her medical needs.[8] That right is well-settled in the law. To state a claim for deliberate indifference to medical needs, Ms. Foster must allege a serious medical need, the officers' deliberate indifference to that need, and a causal link between the officers' indifference and her resulting injury. *See Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (citing *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009)).

A "serious medical need" is "one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), overruled in part on other grounds by *Hope v. Pelzer*, 536 U.S. 730 (2002). Alternatively, "a serious medical need is determined by whether a delay in treating the need worsens the condition." *Mann*, 588 F.3d at 1307 (citing *Hill*, 40 F.3d at 1188-89). "In either case, 'the medical need must be one that, if left unattended, poses a substantial risk of serious harm.'" *Id.* (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)).

Ms. Foster has alleged a serious medical need. She suffered from serious

---

[8] The Court infers that Ms. Foster was held at Madison County Jail as a pre-trial detainee because Ms. Foster does not allege she was a convicted inmate. Therefore, her right to be free from deliberate indifference to her medical needs arises from the Fourteenth Amendment. *See Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) ("As a pretrial detainee at Pickens County Jail, Melton's rights arose under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment."). Even if she were a convicted inmate, in which case the right would arise under the Eighth Amendment, Ms. Foster's claims would be subject to the same scrutiny. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009).

withdrawal symptoms while incarcerated. (Doc. 60, ¶¶ 38, 40). She had elevated blood pressure on numerous occasions. (Doc. 60, ¶¶ 39-42.1, 45, 48, 55, 56, 59). She exhibited slurred speech, limited control of her body, shaking, sweating, strokes, and seizures. (Doc. 60, ¶¶ 43, 47, 50-51, 53, 58, 61). Therefore, Ms. Foster has satisfied the first element of pleading a deliberate indifference to medical needs claim.

To satisfy the deliberate indifference element of her claim, Ms. Foster must sufficiently allege that each correctional officer had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that is more than gross negligence. *See Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010).

To have subjective knowledge, a defendant "must *both* be aware of facts from which the inference could be drawn that a substantial risk of harm exists, *and* must also draw the inference." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (emphasis in original) (internal quotation marks and alteration omitted) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The Court may infer that a defendant had subjective knowledge from circumstantial evidence or from the fact that the risk was obvious. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (citing *Farmer*, 511 U.S. at 842).

Accepting the factual allegations in the amended complaint as true, Ms.

Foster has sufficiently alleged that each correctional officer had subjective knowledge of a risk of serious harm to Ms. Foster. Ms. Foster states she was "harassed and ridiculed by the [o]fficers . . . while she endured numerous strokes and seizures." (Doc. 60, ¶ 51). She asserts that all of the correctional officers saw her "shaking, sweating[,] and knew she was having strokes" and that her condition "was getting worse as the hours progressed." (Doc. 60, ¶¶ 55.1. 59.1, 60.1). The officers "kept telling her she was faking even though she was slurring her speech, biting her tongue, and had limited control of her body." (Doc. 60, ¶ 47). Officers Spicer and Beasley found Ms. Foster twitching in her bunk after a request for emergency assistance from another inmate. (Doc. 60, ¶ 59). Officers Maloney, Patton, Spicer, Beasley, and Williams left Ms. Foster to lie on the ground during commissary. (Doc. 60, ¶ 58). Officer Anderson completed an incident report regarding Ms. Foster's hospitalization following signs of a stroke. (Doc. 60, ¶ 63.1). These allegations, accepted as true, show that the correctional officers had subjective knowledge of a substantial risk of harm to Ms. Foster.

Also, Ms. Foster has sufficiently alleged that the correctional officers disregarded the risk. Ms. Foster claims that each officer knew she had to be sent to a hospital to treat her obvious medical needs, but none provided her with any medical care, and instead "watched [her] deteriorate." (Doc. 60, ¶¶ 52, 55.1. 59.1, 60.1).

Ms. Foster must sufficiently allege that the correctional officers' disregard amounted to "more than gross negligence." *Townsend*, 601 F.3d at 1158. As the Eleventh Circuit has explained:

> The meaning of "more than gross negligence" is not self-evident but past decisions have developed the concept. In cases that turn on the delay in providing medical care, rather than the type of medical care provided, we have set out some factors to guide our analysis. Where the prisoner has suffered increased physical injury due to the delay, we have consistently considered: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay. *See Hill*, 40 F.3d at 1189.

*Goebert*, 510 F.3d at 1312.

Ms. Foster's allegations satisfy each of the "more than gross negligence" factors. As previously discussed, her medical needs were very serious—strokes, seizures, slurred speech, and limited body control. Her health deteriorated because she did not receive adequate medical treatment. At first, Ms. Foster experienced stomach cramps and increased anxiety due to elevated blood pressure. (Doc. 60, ¶ 40). Then, she started "slurring her speech, biting her tongue, and had limited control of her body." (Doc. 60, ¶ 47). She was placed on blood pressure watch, but "soaring blood pressure . . . left virtually untreated for days" caused strokes and seizures. (Doc. 60, ¶ 50). Without proper treatment, she was hospitalized due to signs of a stroke and now suffers from severe and permanent ailments. (Doc. 60, ¶¶ 62, 65-66). Ms. Foster alleges that throughout, correctional officers ridiculed her and made no effort to help her receive medical care. Assuming the truth of Ms.

Foster's allegations given the obviousness and seriousness of Ms. Foster's medical needs, the substantial deterioration of her health over a fairly short time, and the correctional officers' choice to mock her rather than seek medical assistance, the officers conduct could amount to more than gross negligence.

The final element in a deliberate indifference to medical needs claim is a "causal link between the defendants' indifference and the plaintiff's resulting injury." *Melton*, 841 F.3d at 1220. If proven, the circumstances surrounding Ms. Foster's deteriorating condition could demonstrate causation. The correctional officers took no action or grossly inadequate action while Ms. Foster's health deteriorated and ultimately required a lengthy hospitalization.

Therefore, viewing Ms. Foster's allegations in the light most favorable to her, Ms. Foster has established that the officers were subjectively aware of Ms. Foster's serious medical needs, but deliberately disregarded those needs, thereby causing Ms. Foster's alleged permanent medical injuries and suffering. If these allegations are proven to be true, they will demonstrate that the officers violated Ms. Foster's clearly established Fourteenth Amendment right to be free from deliberate indifference to serious medical needs. Thus, the correctional officers are not entitled to qualified immunity at this stage of the proceedings.

2. Negligence and wantonness claims against the correctional officers

The correctional officers argue that Ms. Foster has not stated a claim for

negligent correctional care and wantonness and that state law immunity precludes the claims. (Doc. 64, p. 1).

### a. *Sufficiency of negligence and wantonness allegations*

Under Alabama law,

> To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury. To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty. To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains.

*Hilyer v. Fortier*, 227 So. 3d 13, 22 (Ala. 2017) (internal quotation marks and citations omitted).

A duty to exercise care for a plaintiff may arise from a statute. *Gowens v. Tys. S.*, 948 So. 2d 513, 527 (Ala. 2006); *Thompson v. Mindis Metals, Inc.*, 692 So. 2d 805, 807 (Ala. 1997). Also, a duty of care arises "when it is foreseeable that harm may result if care is not exercised." *Hannah v. Gregg, Bland & Berry, Inc.*, 840 So. 2d 839, 857 (Ala. 2002).

Ms. Foster states that the correctional officers had a duty under Ala. Code § 14-6-19 to provide "necessary medicines and medical attention to those who are sick or injured, when they are unable to provide them for themselves." *See Lancaster v. Monroe Cnty., Ala.*, 116 F.3d 1419, 1431 (11th Cir. 1997) (finding that § 14-6-19 duty applies to non-medical jail personnel). As discussed, Ms.

Foster alleges that the officers were aware of her strokes, seizures, and limited body control but ignored her medical needs, breaching their statutory duty. It is foreseeable that harm may result if proper care is not exercised for an inmate who is suffering from strokes and seizures.

The correctional officers argue that because they cannot diagnose or prescribe clinical care for an inmate, their duty is limited to "provid[ing] inmates with access to licensed healthcare providers, and Plaintiff judicially admits they did so here." (Doc. 85, p. 26). Ms. Foster admits that the officers provided her access to ACH personnel on a few occasions, but her claims for negligence and wantonness are premised on what the officers did not do, and she asserts that the officers' reliance on ACH was itself negligent and wanton. (Doc. 60, ¶¶ 86, 90).

Ms. Foster has established causation and damages for her negligence and wantonness claims in the same way she has established causation and damages for her deliberate indifference claim. Due to the officers' failure to promptly obtain adequate medical care, Ms. Foster's symptoms worsened over time until she was hospitalized. Therefore, Ms. Foster has sufficiently alleged the four elements of a negligence claim.

To state a claim for wantonness, Ms. Foster must also demonstrate that the correctional officers consciously undertook some action or omitted a duty with the knowledge that such action or inaction would probably or likely cause injury. *See*

*Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007); *Tolbert v. Tolbert*, 903 So. 2d 103, 114-15 (Ala. 2004) ("Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, *or with consciousness, that the doing or not doing of some act will likely result in injury*." (emphasis in original) (citation omitted)).  As discussed, Ms. Foster has adequately alleged that the correctional officers recklessly disregarded her obvious medical needs.  (*See* Doc. 60, ¶¶ 40, 47, 50, 55.1. 59.1, 60.1).  The officers knew or should have known that Ms. Foster needed medical attention, but they waited days before getting Ms. Foster to a hospital.  (*See* Doc. 60, ¶¶ 55.1. 59.1, 60.1).  Accepting these allegations as true, the Court finds that Ms. Foster has stated a wantonness claim under Alabama law.

### b. *State law immunity*

The correctional officers argue that sovereign immunity under Ala. Code § 14-6-1 insulates them from Ms. Foster's tort claims.  (Doc. 84, ¶ 19).  Section 14-6-1 provides correctional officers the "same immunities and legal protections granted to the sheriff under the general laws and the Constitution of Alabama of 1901, as long as such persons are acting within the line and scope of their duties and are acting in compliance with the law."  Ala. Code § 14-6-1.[9]  Whether the

---

[9] *See also* Ala. Code § 36-22-3(b) ("Any of the duties of the sheriff set out in subsection (a) or as otherwise provided by law may be carried out by deputies, reserve deputies, and persons employed as authorized in Section 14–6–1 as determined appropriate by the sheriff in accordance with state law. Persons undertaking such duties for and under the direction and supervision of the sheriff shall be entitled to the same immunities and legal protections granted to the sheriff under the general laws and the Constitution of Alabama of 1901, as long as he or

correctional officers are entitled to this immunity will depend on whether they were "acting in compliance with the law" for purposes of § 14-6-1.

Courts have held that a cognizable § 1983 deliberate indifference claim demonstrates noncompliance with the law. In *Sawyer v. Collins*, 2012 WL 6046019 (S.D. Ala. Nov. 2, 2012), the plaintiff brought both a deliberate indifference to medical needs claim and a negligence claim against jailers. Analyzing a motion to dismiss, the United States District Court for the Southern District of Alabama found that the plaintiff established a plausible claim of deliberate indifference. *Id*. at *7. When deciding whether the jailers were entitled to state law immunity from the negligence claim under § 14-6-1, the district court remarked that it could not "say for sure what is meant by [acting in compliance with the law]." *Id.* at *10. Still, the district court decided that a cognizable claim of a constitutional violation stripped the jailers of immunity:

> This conclusion is reached after noting that the Court has already determined that a jury could find that Defendants were deliberately indifferent to [Plaintiff's] serious medical needs . . . . The Court finds that a jury finding that [Defendants] violated the Eighth Amendment, most likely, is not what the drafters of §§ 14–6–1 and 36–22–3 had in mind when they required that sheriff's employees "act[ ] in compliance with the law."

*Id.* at *11. This Court has already recognized that Ms. Foster sufficiently alleged a viable constitutional violation against the Madison County correctional officers.

---

she is acting within the line and scope of his or her duties and is acting in compliance with the law.").

Similarly, Judge Hopkins, writing for this Court, found that state law immunity would not extend to jailers when the plaintiff set out violations of both the Constitution and § 14-6-19. *Hobbs v. Powell*, 138 F. Supp. 3d 1328, 1339 (N.D. Ala. 2015) ("[T]his case involves the potential violation of a constitutional right and a civil statute guaranteeing medical care. The law defendant jailers allegedly violated seems to squarely fall within Justice Shaw's definition of the 'law' for purposes of § 14–6–1." (citation omitted) (referencing the dissenting opinion in *Sawyer*, 129 So. 3d at 1006)). Ms. Foster sufficiently alleges the same violations.

This Court has not found, nor have the correctional officers identified, an interpretation of § 14-6-1 extending state law immunity in the face of a plausible constitutional violation.[10] Accordingly, this Court follows the persuasive authorities discussed above and holds that § 14-6-1 does not grant immunity to correctional officers when a plaintiff adequately alleges a cognizable constitutional violation. *See, e.g., Young v. Myhrer*, 243 F. Supp. 3d 1243, 1258 (N.D. Ala. 2017) ("[O]nly when sufficient evidence exists that a jailer has violated a criminal

---

[10] The correctional officers' case citations do not support their argument for immunity. *See* Doc. 84, ¶ 19 (citing *Johnson v. Conner*, 720 F.3d 1311, 1313-14 (11th Cir. 2013) (declining to interpret "in compliance with the law"); *Young v. Myhrer*, 243 F. Supp. 3d 1243, 1261 (N.D. Ala. 2017) (dismissing tort claims on sovereign immunity grounds in absence of a viable violation of Constitution, civil statute, or criminal statute), *Redding v. Dale Cnty, Ala.*, 2016 WL 1243241, at *7 (M.D. Ala. March 14, 2016) (omitting discussion of "in compliance with the law"), *Stallworth v. Bibb Cnty, Ala.*, 2014 WL 3540521, at *4-5 (N.D. Ala. July 16, 2014) (same)).

statute, a civil statute, or a constitutional principle does he lose the Jailer Act's sovereign immunity protection and become subject to Alabama tort laws."); *Hobbs*, 138 F. Supp. 3d at 1339-40 (refusing to extend immunity to jailers when the plaintiff established violations of the Constitution and a state civil statute); *Johnson v. Milliner*, 65 F. Supp. 3d 1295, 1305 (S.D. Ala. 2014) (denying immunity when factual dispute precluding summary judgment existed over whether the defendant violated the plaintiff's constitutional right). The correctional officers are not protected by § 14-6-1 immunity at this stage of the proceedings.

### C. Mr. Morrison's Motion to Dismiss All Claims

Mr. Morrison asks this Court to dismiss all claims asserted against the estate of Steve Morrison. (Doc. 86). Mr. Morrison argues that Ms. Foster has not stated claims for deliberate indifference to medical needs and conspiracy to violate civil rights under § 1983 and that qualified immunity would preclude both claims if she had. (Doc. 86, ¶¶ 1, 7).

### 1. § 1983 deliberate indifference to medical needs claim against Mr. Morrison

The parties agree that Mr. Morrison cannot be held liable under § 1983 on a theory of respondeat superior or vicarious liability. *See, e.g., Iqbal*, 556 U.S. at 676-77; *West v. Tillman*, 496 F.3d 1321, 1328 (11th Cir. 2007); *Cottone v. Jenne*, 326 F.3d, 1352, 1360 (11th Cir. 2003). Instead, Ms. Foster seeks to hold Mr.

Morrison liable for the deliberate indifference to her medical needs in his status as a supervisor.  (Doc. 60, ¶¶ 70-71; Doc. 102, p. 3).  A plaintiff establishes a claim for supervisor liability by showing that a "supervisor either participated directly in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation."  *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (citing *Cottone*, 326 F.3d at 1360).

> The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a supervisor's custom or policy results in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Cottone*, 326 F.3d at 1360 (internal quotation marks, alterations, and citations omitted).

This Court accepts as true Ms. Foster's allegations establishing a causal connection between Mr. Morrison's actions and the deliberate indifference to her medical needs.  Defendants, including Mr. Morrison, "subjectively knew that [Ms. Foster] suffered from a serious medical need and that she was unable to get medical attention for herself," and that the failure to treat her "would result in serious injury, harm, and/or death."  (Doc. 60, ¶ 70).  Ms. Foster's serious medical needs were "ignored, in part, because of the deliberately indifferent customs or

policies of . . . [Mr.] Morrison . . . to the serious medical needs of prisoners . . . ."
(Doc. 60, ¶ 71).

Allegedly, Mr. Morrison and others implemented "deliberately-indifferent customs or policies" by establishing an "explicit or implicit agreement, plan, and policy of delaying or denying necessary medical treatment to avoid liability for inmate medical bills." (Doc. 60, ¶ 19). Officers were trained to defer to ACH personnel even in the case of a medical emergency and disciplined for contacting outside emergency personnel. (Doc. 60, ¶ 19). Mr. Morrison and others developed a policy by which severe withdrawal symptoms would be managed only inside the jail, even though the defendants were aware such symptoms could only be safely treated in a hospital. (Doc. 60, ¶ 20). Mr. Morrison knew that "ACH had a practice of delaying or denying referrals of inmates for outside medical care . . . that put cost control over inmate health and safety." (Doc. 60, ¶ 25). Mr. Morrison and others were "on notice that their plan was harmful to the health of detainees and jailees" from complaints, deaths, and other lawsuits. (Doc. 60, ¶ 23). Mr. Morrison and others did not take steps to investigate the circumstances of the deaths of six Madison County Jail inmates over the course of four years. (Doc. 60, ¶ 28).

Mr. Morrison did not notify nurses or jailers that the profit motive was removed from the ACH contract, and he did not implement changes to the policies

and customs incentivizing cost control over health and safety.  (Doc. 60, ¶ 17.1).

The pre-amendment policies "continued to play a role in depriving detainees [of] medical care."  (Doc. 60, ¶ 17.1).

This alleged conduct, if proven, would establish that Mr. Morrison was aware that inmates were denied adequate medical care in an effort to control costs, that ACH denied referrals to outside providers when necessary, that inmates suffered serious harm as a result, and that Ms. Foster had serious medical needs that were ignored.  Therefore, Ms. Foster has stated a claim for supervisor liability by alleging a causal connection between Mr. Morrison's actions and the deliberate indifference to her serious medical needs.

Mr. Morrison argues that he is entitled to qualified immunity from § 1983 supervisor liability.  (Doc. 86, ¶ 7).  Mr. Morrison will enjoy qualified immunity unless Ms. Foster has pled facts showing Mr. Morrison violated a constitutional right that was clearly established during her incarceration.  *See al-Kidd*, 563 U.S. at 735 (citing *Harlow*, 457 U.S. at 818).

As the Court explained in the preceding paragraphs, Ms. Foster has pled facts showing that Mr. Morrison violated her Fourteenth Amendment right to be free from deliberate indifference to her serious medical needs by establishing a causal connection between Mr. Morrison's actions and the constitutional deprivation.  As the Court explained in section III.B.1 of this opinion, *infra*, Ms.

Foster's right to be free from deliberate indifference to her serious medical needs was clearly established at all times during her incarceration. Therefore, Mr. Morrison is not entitled to qualified immunity at this stage of the proceedings.

### 2. § 1983 conspiracy to violate civil rights claim against Mr. Morrison

Ms. Foster alleges that a "conspiracy existed between Madison County, [Sheriff] Dorning, [Mr.] Morrison, ACH, Dr. Williams, and others that resulted in the actual denial of [her] constitutional right to medical care for her serious medical needs." (Doc. 60, ¶ 77). She claims that the defendants "reached an understanding" to deny her rights. (Doc. 60, ¶ 77). Mr. Morrison counters that the factual content of the amended complaint is insufficient to state a plausible conspiracy claim and is otherwise barred by the "intracorporate conspiracy doctrine." (Doc. 86, ¶¶ 15-16).

Ms. Foster may state a viable § 1983 claim for conspiracy to violate civil rights by "showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right." *Grider v. City of Auburn, Ala*., 618 F.3d 1240, 1260 (11th Cir. 2010) (citing *GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1370 (11th Cir.1998)). She must show that the alleged conspirators reached an understanding to deny her rights, conspiratorial acts that impinged upon her rights, and an actionable wrong to support the conspiracy. *Id*. As previously discussed, Ms. Foster has sufficiently alleged that Mr. Morrison took actions impinging on

her constitutional right to be free from deliberate indifference to her serious medical needs. Thus, whether Ms. Foster has sufficiently alleged that Mr. Morrison and other defendants reached an understanding to deny her rights will determine whether Ms. Foster has stated a § 1983 claim for conspiracy. *See Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty.,* 956 F.2d 1112, 1122 (11th Cir. 1992) ("[T]he linchpin for conspiracy is agreement.").

Ms. Foster has pled a plausible claim of conspiracy. Ms. Foster alleges that Mr. Morrison and other named defendants had an "explicit or implicit agreement, plan, and policy of delaying or denying necessary medical treatment to avoid liability for inmate medical bills" (Doc. 60, ¶ 19), developed a policy and practice by which severe withdrawal symptoms would be treated only within the jail (Doc. 60, ¶ 20), knew that amending the contract with ACH would not cure the policy elevating costs over health and consciously decided to keep deliberately indifferent policies in place (Doc. 60, ¶¶ 17.1, 17.2), knew that ACH denied referrals to control costs (Doc. 60, ¶¶ 18-19), and knew of the risks of the practice but "explicitly agreed or implicitly agreed to this practice to avoid the costs associated with hospitalization" (Doc. 60, ¶ 20). These allegations, viewed in the light most favorable to Ms. Foster, permit the inference that an agreement was reached or an understanding existed between Mr. Morrison and other defendants to deprive Ms. Foster of her constitutional right to be free from deliberate indifference to her

serious medical needs.

The intracorporate conspiracy doctrine does not preclude Ms. Foster's conspiracy claim. The intracorporate conspiracy doctrine provides that an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). The doctrine applies to public entities. *Grider*, 618 F.3d at 1261. Essentially, Mr. Morrison argues that Ms. Foster has alleged an unactionable conspiracy between agents of the same legal entity.

In fact, Ms. Foster alleges a conspiracy between three separate entities: Madison County, Sheriff Dorning, who delegated his duties to Mr. Morrison, and ACH and its agents. (Doc. 60, ¶ 77). Sheriff Dorning, and by extension Mr. Morrison, is an executive officer of the State of Alabama, not Madison County. *See Ex parte Sumter Cnty.*, 953 So. 2d 1235, 1238 (Ala. 2006); *King v. Colbert Cnty.*, 620 So. 2d 623, 625 (Ala. 1993); *Parker v. Amerson*, 519 So. 2d 442, 443 (Ala. 1987). ACH is a private corporation contracted to provide services in the Madison County Jail. (Doc. 60, ¶¶ 2-3). ACH is not an agent of the County, nor is Mr. Morrison an agent of ACH. No named entity is an agent of another. Therefore, the intracorporate conspiracy doctrine does not bar Ms. Foster's § 1983 conspiracy claim.

## IV. CONCLUSION

Based on the foregoing reasons, the Court grants Madison County's motion to dismiss as to the civil conspiracy claim and denies the remainder of Madison County's motion to dismiss. The Court denies the correctional officers' motion to dismiss and denies Mr. Morrison's motion to dismiss.

**DONE** and **ORDERED** this September 21, 2018.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE